# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

| | |
|---|---|
| MELODIE LYNN REAM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 3:14-cv-224-PPS |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Melodie L. Ream appeals the Social Security Administration's decision to deny her application for disability insurance benefits. An administrative law judge found Ream was not disabled within the meaning of the Social Security Act. As explained below, I find the ALJ erred by disregarding the opinion of Ream's treating physician and will therefore remand this matter to the ALJ to fully and properly develop the administrative record.

## BACKGROUND

Ream is a fifty-four year-old woman with a high school education. She has spent most of her working life on her feet. For sixteen years, she worked at a greeting card store in a South Bend mall. (R. 43-44). After that, she worked six years as a factory manager at a fragrance manufacturing company. (R. 41). In 2004, she landed a position as a receptionist at a beauty salon, which, you would think would be a desk job. Instead, Ream spent the bulk of her time on her feet, cleaning tanning beds or mixing

chemicals. (R. 40-41). Ream quit working in 2006 for personal reasons. She testified that she wanted to spend more time with her high-school-aged daughter before the daughter went off to college. (R. 39).

Ream's health problem - there is only one - began 2008, right after her daughter graduated high school. In June of that year, Ream fell down stairs in her house, injuring her left ankle. (R. 45). Initially, she thought it was a sprain. *Id.* But after the pain continued for a month, she went to the Emergency Room where an x-ray showed that she might have broken her foot. (R. 233). The doctor put her foot in an air-cast and told her to rest, but the pain did not abate. In fact, it got worse. By October, Ream still couldn't put any weight on her left foot. (R. 45). In addition, she had begun to experience shooting pains in both of her feet, along with tightness and burning sensations. (R. 210). The pain was severe and occurred regardless of whether she was resting or exerting herself. *Id.* It was so bad she needed cane to get around. (R. 45).

Ream saw some specialists, but it was her family physician, Dr. Cynthia Heckman-Davis, who finally put the pieces together. In March 2009, Dr. Davis diagnosed Ream as having peripheral neuropathy caused by stenosis, or narrowing, of her arterial walls. (R. 46, 203-04). Peripheral neuropathy is degenerative condition that results from damage to a person's peripheral nerves, often caused by traumatic injuries.[1] It causes numbness, pain, and weakness in a person's hands or feet.

---

[1] See Mayo Clinic, Diseases and Conditions: Peripheral Neuropathy, available at http://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/basics/definition/con-20019948 (last visited March 18, 2015).

In April 2009, a lower extremity arterial evaluation revealed no evidence of stenosis in Ream's major vessel arterial walls, but suggested she had a small vessel disease involving her toes. (R. 227). Dr. Davis interpreted this result as confirming her diagnosis and started Ream on a regimen of anti-spasm medication, pain killers, and Cymbalta, an anti-depressant used to treat peripheral neuropathy. (R. 201, 204, 207). The medication has helped control the worst of Ream's pain, although she testified that she still feels constant pain in her feet and ankles and can't stand or sit for more than ten or twenty minutes at a time. (R. 47-49). Ream tried physical therapy and acupuncture for several years with only intermittent improvement. (R. 242-250). After she quit, Ream's therapist stated that Ream's condition was "beyond the care and treatment and evaluation from this office." (R. 242). Dr. Davis has opined that Ream's condition is not remediable. (R. 307).

Ream applied for disability insurance benefits in March 2012, alleging a disability onset date of June 18, 2008. After a hearing before an ALJ in which Ream testified, the ALJ issued a decision denying benefits. (R. 16-26.) The ALJ employed the standard five-step analysis. At step one, the ALJ confirmed that Ream had not engaged in substantial gainful activity since her application date. At step two, the ALJ found Ream suffered a severe impairment, namely peripheral neuropathy. At step three the ALJ found that Ream's conditions did not satisfy any listed impairment. At step four, in analyzing Ream's residual functional capacity, the ALJ found that Ream could perform light work. More specifically, the ALJ found Ream had the capacity to lift, carry, push and

pull up to 20 pounds occasionally and 10 pounds frequently, stand and/or walk for about 6 hours of an 8 hour workday, and sit for at least 6 hours of an 8 hour workday. At step five, the ALJ found Ream could perform her past relevant work and also that there were a sufficiently significant number of jobs in the national economy she could perform.

The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Ream timely sought review of that decision by filing this case.

## DISCUSSION

My review of an ALJ's decision to deny social security benefits is limited to determining whether the decision is supported by substantial evidence. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). "Evidence is substantial if a reasonable person would accept it as adequate to support the conclusion." *Id.*

Ream makes two arguments against the ALJ's decision. First, she argues the ALJ erred in evaluating her RFC by ignoring the opinion of her treating physician, Dr. Cynthia Heckman-Davis. Second, she argues the ALJ erred by improperly assessing Ream's credibility. The first issue requires remand, so I will concentrate there.

A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *see White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). An ALJ must offer

4

"good reasons" for discounting the opinion of a treating physician. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).

Dr. Davis, who has treated Ream since at least January 2008, filled out two Lower Extremities Impairment Questionnaires, one dated October 12, 2011 and the other July 6, 2012. (R. 293-300, 351-58). In addition, Dr. Davis provided a narrative report regarding Ream's condition. (R. 306-07 ). In all three documents, Dr. Davis opined that Ream had chronic, degenerative peripheral neuropathy in both legs and that the pain from the neuropathy made it difficult for her to stand or sit for more than 20 minutes at a time. (R. 295, 306, 354). She further opined that Ream couldn't stand for more than four hours in a day, and could only do that if she were given frequent opportunities to sit and rest. (R. 296). The ALJ gave Dr. Davis's opinions "little weight." (R. 23).

This is a close call. On the one hand, the ALJ discussed Dr. Davis's opinions at length and pointed out some legitimate inconsistencies between Dr. Davis's statements and the record. For example, Dr. Davis opined that Ream had trouble bending due to her neuropathy, while Ream testified that she could, in fact, bend. (R. 49-50, 306). And Dr. Davis expressed a different opinion regarding the onset date of Ream's condition in the Questionnaires than in the September 2012 letter. (R. 299, 306).

On the other hand, the ALJ stated that there was no evidence of Ream's toes exhibiting blue discoloration in the treatment notes when there was such evidence. (R. 23, 210). And he perceived a contradiction that I do not see between Dr. Davis's opinion

5

that Ream could handle low stress at work and his opinion that Davis would have concentration problems due to her pain. (R. 23).

Inconsistencies aside, Dr. Davis's statements and notes remain the only significant source of medical evidence in this case. This is a problem. One thing an ALJ cannot do is substitute his own judgment for that of a medical professional, or make medical conclusions about a claimant's illness, without relying on medical evidence. *See Clifford v Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *Green v. Apfel*, 204 F.3d 780, 781-82 (7th Cir. 2000). When the ALJ attempted to refute Dr. Davis's statements, the dearth of medical evidence led him to rely on his lay judgments about medical records.

One of the primary reasons the ALJ gave for discounting Dr. Davis's opinion was his contention that the diagnostic testing Ream underwent "failed to reveal significant abnormalities." Ream underwent an MRI, a bone scan, and a Arterial Evaluation study (R 227-33). Dr. Davis examined the test results and concluded that the they confirmed her diagnosis of peripheral neuropathy. (R. 306). The ALJ felt otherwise. He found that the test results did not square with Dr. Davis's opinion regarding the severity of Ream's condition. He may be correct, but there isn't any medical opinion in the record supporting his position. The examining physician did not have access to Ream's test results so could offer no opinion on them. (R. 260). The government's non-examining physicians did take a look at the medical record. They concluded Ream did not have severe neuropathy, but did not comment specifically on the tests or any other piece of evidence. (R. 262, 287). So the ALJ's opinion regarding the test results is his own.

6

The Seventh Circuit has cautioned that an ALJ "should avoid commenting on the meaning of a test or clinical x-ray when there has been no supporting expert testimony." *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982). *See also Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996) (stating that "an ALJ, as a lay person, is not qualified to interpret raw data in a medical record"). If the ALJ felt Dr. Davis's testimony was insufficient, he should have called on a medical expert to testify. *See Scott*, 647 F.3d at 741 ("If the ALJ found this evidence insufficient, it was her responsibility to recognize the need for additional medical evaluations").

The ALJ also faulted Dr. Davis for not ordering a nerve conduction study or an electromyography that could have confirmed the peripheral neuropathy diagnosis (R. 23). Here too, the ALJ should have taken action if he felt that the record was insufficient. While a claimant bears the burden of proving disability, the ALJ has a duty to develop a full and fair record. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). That means recognizing the need for additional evaluation or testimony where evidence is insufficient. *See Scott*, 647 F.3d at 741; *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (noting that an ALJ has a "duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable" and finding the ALJ should have contacted the plaintiff's doctor for more detail.); *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003).

There is an additional problem with the ALJ's order that requires remand. The ALJ found that Ream had a severe impairment of peripheral neuropathy, but

7

determined that Ream could stand for 6 hours in a day without explaining how he came up with that figure (R. 20). There is no evidence in the record suggesting Ream could stand for six hours. Dr. Davis opined that Ream would have trouble standing for more than 15 minutes at a time and could, at most, stand 4 hours a day. The state's examining physician did not offer an opinion on the issue. (R. 262-264). Nor did anyone else. The ALJ is required to explain how he reached his conclusions. *Barrnett*, 355 F.3d at 1068. By not explaining how he came up with the six-hour-a-day figure, the ALJ has failed to build the requisite logical bridge between the evidence and his conclusion. *Scott*, 647 F.3d at 740.

## CONCLUSION

For the reasons stated above, this cause is **REMANDED** for further proceedings consistent with this order.

**SO ORDERED.**

ENTERED: March 30, 2015   s/ Philip P. Simon
　　　　　　　　　　　　　　PHILIP P. SIMON, CHIEF JUDGE
　　　　　　　　　　　　　　UNITED STATES DISTRICT COURT